EUGENE F. JOHNSON AND CHARLOTTE M. JOHNSON *v.* MOTORS DISPATCH, INC., JONES MOTOR COMPANY, EEZZ TRUCK, INC., AND LAWRENCE P. MOORE.

[No. 2-875A216. Filed February 23, 1977. Rehearing denied April 14, 1977. Transfer denied July 7, 1977.]

*James L. Larson, Dennis D. Sutton, Jackson, Parrish, Eggers & Larson,* of Fort Wayne, for appellants.

*Carl J. Suedhoff, Jr., Hunt, Suedhoff, Borror, Eilbacher & Lee,* of Fort Wayne, for appellees.

LOWDERMILK, J.—The instant case was transferred to this office from the Second District in order to lessen the disparity in caseloads among the Districts.

Plaintiffs-appellants Eugene F. and Charlotte M. Johnson appeal from the trial court's summary judgment in favor of defendants-appellees Jones Motor Company (Jones) and EEZZ Truck, Inc. (EEZZ).

Affirmed in part and reversed in part.

The Johnsons instituted the instant action against Motors Dispatch, Inc. (Motors Dispatch), Jones, EEZZ, and Lawrence P. Moore in order to recover for injuries which Eugene sustained in a motorcycle-truck collision on October 12, 1971; in Fort Wayne, Indiana, and to recover for Charlotte's loss of Eugene's services.

EEZZ owned the semi-tractor which Moore was driving. EEZZ leased the tractor and the trailer with which Eugene collided to Jones.

On October 12, 1971, Moore drove the rig for Jones, hauling a load of steel bars from Gary, Indiana, to Detroit, Michigan. In order to avoid motoring back to Gary without a load Moore telephoned the dispatcher at Jones' Detroit terminal and asked if he could haul a load going west; when he learned that Jones had no loads going west Moore secured a trip lease of the rig by Motors Dispatch to transport a load of steel coils from Detroit to Tipton, Indiana. Before signing the trip lease on behalf of Jones, Moore followed the instructions of Jones' Detroit dispatcher and called Jones' Pittsburgh, Pennsylvania,

office to get a trip lease number and permission to haul the trip lease load.

En route to Tipton the collision occurred.

The issue here is whether the trial court erred in granting summary judgment to Jones and EEZZ.

A trial court shall enter summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file—together with any affidavits or testimony— show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Rules of Procedure, Trial Rule 56 (C). In determining whether a genuine issue of material fact exists, all doubts must be resolved against the party moving for summary judgment; all facts set forth by the party opposing the motion must be accepted as true. *Union State Bank* v. *Williams* (1976), 169 Ind. App. 345, 348 N.E.2d 683.

Jones and EEZZ assert that Motors Dispatch, as the lessee under the trip lease, was exclusively liable for Eugene's injuries as a matter of law. They rely on the Motor Carrier Act of 1935[1] and the Interstate Commerce Commission regulations promulgated thereunder. 49 U.S.C. § 304 (e) provides:

"Subject to the provisions of subsection (f) of this section, the Commission is authorized to prescribe, with respect to the use by motor carriers (under leases, contracts, or other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property—

(1) regulations requiring that any such lease, contract, or other arrangement shall be in writing and be signed by the parties thereto, shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby; and

(2) such other regulations as may be reasonably necessary in order to assure that while motor vehicles are

1. 49 U.S.C. §§ 301-327, which is Part II of the Interstate Commerce Act.

being so used the motor carriers will have full direction and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insurance covering all such equipment."

The I.C.C. regulation authorized by this statute states:

"[A]uthorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

The contract, lease, or other arrangement for the use of such equipment:

\* \* \*

Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement . . ." 49 C.F.R. § 1057.4(a)(4).

The trip lease in the case at bar conformed to this regulation.

For a background of the federal law pertaining to this case we turn to *Transamerican Freight Lines* v. *Brada Miller Freight Systems* (1975), 423 U.S. 28, 96 S.Ct. 229, at 233-234, 46 L.Ed.2d 169.

"Demand for a motor carrier's services may fluctuate seasonally or day by day. Keeping expensive equipment operating at capacity, and avoiding the waste of resources attendant upon empty backruns and idleness, are necessary and continuing objectives. It is natural, therefore, that a carrier that finds itself short of equipment necessary to meet an immediate demand will seek the use of a vehicle not then required by another carrier for its operations, and the latter will be pleased to accommodate. Each is thereby advantaged.

"A lease of equipment, which is permissible under defined circumstances, must be distinguished, however, from a sharing or lending of operating authority, which is not permitted. Under the Motor Carrier Act . . . only a properly certificated carrier may haul freight in interstate or foreign

commerce. Each certificate is limited as to routes, destinations, and classes of "freight . . . As a consequence, the Commission has developed and designed its responsibility and control regulations in order to prevent a sharing of operating authority under the guise of a lease of equipment. With only special exceptions, the regulations require the lessee to ship under its own bill of lading, to compensate the lessor on an established basis, to inspect the equipment, and to assume full control and responsibility for the operation . . . The regulations, however, do not require the lessee itself to operate the equipment; the lessor may perform that task by furnishing the driver with equipment. But the lessee must assume the responsibility for the shipment and have full authority to control it.

"The regulations were formulated in the 1950's . . . The initial formulation was sustained, against a variety of attacks, in *American Trucking Assns.* v. *United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). There the Court outlined as background 'the existing conditions of the motor truck industry and its regulation.' *Id.,* at 302, 73 S.Ct. at 310. It referred to the development of the practice by authorized carriers of using nonowned equipment by interchange and by leasing. *Id.,* at 303, 73 S.Ct. at 311. 'The use of nonowned equipment by authorized carriers is not illegal, either under the Act or the rules under consideration.' *Id.,* at 303-304, 73 S.Ct. at 311. But it is noted that the record in that case contained proof of abuses and evasions of certificated authority and of safety requirements, difficulties in the fixing of the lessee's responsibility, and other problems. *Id.,* at 304-306, 73 S.Ct., at 311-312.

"After a detailed examination of the proceedings of the Commission that resulted in the promulgation of the protective provisions at issue in this case, the Court observed: 'The purpose of the rules is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system,' and to assure safety of operation. *Id.,* at 310, 73 S.Ct., at 314. 'So the rules in question are aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress.' *Id.,* at 311, 73 S.Ct., at 315. It is apparent, therefore, that sound transportation services and the elimination of the problem of a transfer of operating authority, with its attendant difficulties of enforcing safety requirements and of fixing financial responsibility for damage and injuries to shippers and members of the public, were the significant aims and guideposts in the development of the comprehensive rules." (Citations omitted)

The position of Jones and EEZZ is contrary to *Vance Trucking Co.* v. *Canal Insurance Co.* (D.S.C. 1966), 249 F. Supp. 33, *aff'd.* (4th Cir. 1968), 395 F.2d 391, *cert. den.* (1968), 393 U.S. 845, in which it was decided that the responsibility of Vance (the lessee) did not release Forrester (the lessor) from liability where Forrester *in fact* at the time of the collision held a right of control over the negligent driver. The court stated at 249 F. Supp. 39:

> "The Interstate Commerce Act and the regulations issued thereunder obviously are not designed to excuse a party from liability which he might otherwise have. Thus, a determination that Vance is responsible under the Act and regulations does not preclude a finding that Forrester was also responsible."

Jones and EEZZ rely on *Alford* v. *Major* (7th Cir. 1972), 470 F.2d 132, for the proposition that it contravenes public policy for the lessor to be answerable—in addition to the lessee—for the negligence of the driver.

If *Alford* v. *Major* ever stood for the idea that public policy dictates that a lessee's responsibility must be exclusive, it was rejected in *Transamerican Freight Lines* v. *Brada Miller Freight Systems, supra,* wherein the United States Supreme Court reversed a grant of summary judgment which followed *Alford* v. *Major*. The court pointed out:

> "It is to be acknowledged, to be sure, that the lessor's furnishing of a driver allows an aspect of control, in a sense, to remain in the lessor. But this is ministerial control of the kind with which the Commission was concerned in *Ex parte* No. MC-43. Its concern, as we have noted, was with operating authority, with routes and destinations and classes of freight, with the integrity of certifications, and with that ultimate control in the lessee that makes and keeps it responsible to the public, the shipper, and the Commission.
>
> *      *      *
>
> "An indemnification provision with respect to the lessor's negligence does not necessarily tend to lessen operational safety. On the contrary, it may increase it. The lessor, as a general rule, is the party more familiar with the equipment it leases and with the experience, ability, and record of the driver it furnishes. An agreement placing the ultimate

financial responsibility upon the negligent lessor thus may have a tendency to provide greater protection to the public and to shippers. At the same time, the lessee's control and responsibility may then become more meaningful. It may also be said that the indemnification provision produces an additional source of funds for the one who is damaged or injured." 96 S.Ct. at 235-236.

See *Carriers Insurance Exchange* v. *Truck Insurance Exchange* (4th Cir. 1962), 310 F.2d 653.

The responsibility to the public for a driver's negligence which is imposed upon a lessee by 49 C.F.R. § 1057.4(a)(4) is not exclusive as a matter of law; a lessor who is otherwise liable for said negligence is not released by the imposition of responsibility upon the lessee as well. *Vance Trucking Co.* v. *Canal Insurance Co., supra.* We therefore focus on the Indiana law pertaining to whether Jones and/or EEZZ were liable for Moore's acts.

Under the doctrine of respondeat superior a master is liable for the physical torts which his servant commits while acting within the scope of the servant's employment. *State* v. *Gibbs* (1975), 166 Ind. App. 387, 336 N.E.2d 703. Whether the servant was acting within the scope of his employment at the time the tort was committed is a question of fact. *Id.* However, the case at bar involves the threshold issue of who was Moore's master.

In *New York Central Railroad Co.* v. *Northern Indiana Public Service Co.* (1966), 140 Ind. App. 79, 221 N.E.2d 442, this court decided a case in which the lessor furnished both a piece of equipment and its operator to the lessee; the parties disputed whether the operator was the servant of the lessor or of the lessee under the "borrowed servant doctrine." This court stated at 140 Ind. App. 85:

"In their argument and briefs both the appellee and the appellant overlooked that there was a third possibility: to-wit: that the operator could have been the employee of both employers. The Restatement of Agency, Second, acknowledges this concept in § 226 where it is stated:

'A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.' Certainly there is nothing in the facts at bar that involves an abandonment of the service of either of the possible employers while operating the crane. The operator was furthering the business of both. Consequently, as to the particular act in question the operator might have been the employee of both the appellant and Kirsh Company or Varday, Inc. *Normally the choice between the three alternatives is a question of fact. . . ."* (Our emphasis)

Justice Hunter discussed the confusing law in this area at 140 Ind. App. 89-91:

"[T]here can be found three leading theories used to analyze the borrowed servant situation. First, is the 'whose business' test. This test attempts to discern whether the operator was furthering the business of the special or general employer . . .

"Second is the 'control test' which is normally used in conjunction with the 'whose business' test. This test attempts to analyze the borrowed servant question by finding which employer had the right to control the specific act in question. As will be shown subsequently, the results can vary with the facts chosen to be emphasized . . .

"The third test, 'the scope of business' was developed to cure the ambiguities and confusion that resulted from the application of the 'whose business' and 'control' tests . . .

"As previously shown, Indiana has adopted the 'control' and 'whose business' tests in attempting to discern which employer had the right to control the specific act in question.

"We would not necessarily adopt the scope of business test nor would we reject it . . . [T]his test can result in much the same confusion as the control test due to the fact that in the borderline cases as in the facts at bar, *an operator leased with the crane is many times operating with the scope of business of both employers.*" (Our emphasis)

In Moore's deposition he explained that Motors Dispatch issued a check payable to Jones and EEZZ; Jones kept a certain percentage, paid 29 percent to Moore as part of his regular pay, and paid a certain percentage to EEZZ.

Resolving all doubts against Jones, and EEZZ, there was a genuine question of material fact under the "whose business"

test, to-wit: whether Motors Dispatch, Jones, and EEZZ all benefited from the trip lease haul. And see *Transamerican Freight Lines* v. *Brada Miller Freight Systems, supra.*

In *Motor Dispatch, Inc.* v. *Snodgrass* (1973), 157 Ind. App. 591, 301 N.E.2d 251, this court held that under a trip lease identical to the one in this case the finder of fact could find that there was "mixed control" over the driver by Motor Dispatch and the lessor who furnished both the truck and driver.

Jones and EEZZ rely on *Littleton* v. *Mardigan* (7th Cir. 1972), 458 F.2d 251, for the proposition that as a matter of law the trip lease vested exclusive control of Moore in Motors Dispatch. This case held that the United States District Court for the Southern District of Indiana properly granted summary judgment to the lessor of a truck and driver where the determinative factors were the interpretation of the lease *and* consideration of undisputed facts pertaining to the "whose business" and "control" tests.

However, there existed in the case at bar a question of fact which was involved in the "whose business" test.

The trip lease here did not establish as a matter of law that only Motors Dispatch possessed a right to control Moore. See *Motor Dispatch, Inc.* v. *Snodgrass, supra; New York Central Railroad Co.* v. *Northern Indiana Public Service Co., supra.* See also *Transamerican Freight Lines* v. *Brada Miller Freight Systems, supra.*

As this court pointed out in *New York Central Railroad Co.* v. *Northern Indiana Public Service Co., supra,* a servant may be acting within the "scope of business" of both the lessor and the lessee in a fact situation such as the one which confronted the trial court.

Inasmuch as there existed genuine questions of material fact as to whether both Motors Dispatch and Jones were Moore's masters and as to whether Moore's acts were within

the scope of his employment, we find that the trial court erred in granting summary judgment to Jones. TR. 56(C). However, the documents which the trial court considered did not present a genuine question of material fact as to whether EEZZ had a right to control Moore's driving.

We therefore affirm that part of the judgment awarding summary judgment to EEZZ and reverse that part awarding summary judgment to Jones and remand this cause to the trial court and instruct the judge thereof to amend his judgment accordingly.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 360 N.E.2d 224.